UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

AVEOS FLEET PERFORMANCE, INC.,
                 Plaintiff,                         8:11-CV-0950
                                                (GTS/CFH)
v.

VISION AIRLINES, INC.,
                     Defendant.
_____

APPEARANCES:                          OF COUNSEL:

CONDON & FORSYTH LLP          JOHN MAGGIO, ESQ.
  Counsel for Plaintiff
7 Times Square
New York, NY 10036

THE FOONT LAW FIRM           BRIAN E. FOONT, ESQ.
  Counsel for Plaintiff
11909 Reynolds Avenue
Potomac, MD 20854

GANZ WOLKENBREIT & SIEGFELD LLP     ROBERT E. GANZ, ESQ.
  Counsel for Defendant
One Columbia Circle
Albany, NY 12203

HON. GLENN T. SUDDABY, United States District Judge

**<u>MEMORANDUM-DECISION and ORDER</u>**

      Currently before the Court in this diversity action for breach of contract is a motion for

summary judgment filed by Aveos Fleet Performance Inc. ("Plaintiff") (Dkt. No. 28) against

Vision Airlines, Inc. ("Defendant").  For the reasons set forth below, Plaintiff's motion is denied.

I.      **RELEVANT BACKGROUND**

A.      **Plaintiff's Claim**

Generally, liberally construed, Plaintiff's Complaint alleges that Defendant breached the terms of an Agreement entered into by the parties on April 2, 2009, and that as a result, Plaintiff is entitled to damages of $3,959,256.49 plus interest through the date payment is made in accordance with the Agreement, as well as prejudgment interest and costs.

B.      **Motion for Summary Judgment by Plaintiff**

Generally, in support of its motion for summary judgment, Plaintiff argues that (1) it performed its obligations under the Agreement, (2) Defendant breached the Agreement, and (3) as a result, Plaintiff has suffered damages.  (*See generally* Dkt. No. 28-18 [Pl.'s Mem. of Law].)

In Defendant's response to Plaintiff's motion for summary judgment, it argues that Plaintiff is not entitled to summary judgment because (1) Plaintiff did not perform all of its obligations under the Agreement, (2) Defendant did not breach the Agreement because it paid for the work Plaintiff completed and objected to the invoices that currently remain unpaid, and (3) Plaintiff owes Defendant its remaining engines and parts.  (*See generally* Dkt. No. 30 [Def.'s Response Mem. of Law].)

In its reply, Plaintiff argues that (1) it is undisputed that it performed its obligations under the Agreement, and (2) it is undisputed that Defendant breached the Agreement because (a) Defendant has failed to provide evidence of payment, and (b) Defendant has failed to provide evidence of its alleged notices of dispute.  (*See generally* Dkt. No. 31 [Pl.'s Reply Mem. of Law].)

### C.     Factual Background

Unless otherwise noted, the following material facts have been asserted and supported by Plaintiff in its Local Rule 7.1 Statement of Undisputed Material Facts, and either admitted or denied without a supporting record citation by Defendant in its Local Rule 7.1 Response. (*Compare* Dkt. No. 28-1 [Pl.'s Rule 7.1 Statement] *with* Dkt. No. 30-2 [Def.'s Rule 7.1 Response].)

The parties entered into the Engine Technical Services Agreement ("the Agreement") on April 2, 2009.  Pursuant to Annex E of the Agreement,

> [Plaintiff] will work collectively with [Defendant] to produce six (6) JT9D-7R4D engines to support the current three (3) B767 aircraft in [Defendant's] fleet.   [Plaintiff] shall purchase on behalf of [Defendant][1] and subsequently transfer to [Defendant] title to six (6) engines from Air Canada for parts to support the program, so collectively there will be twelve (12) engines to produce (6).[2]  The program will be governed by the following guidelines, and should there by additional JT9D-7R4D engines for repair, they will be managed under the Rates and Charges set forth in Annex A.
>
> It is understood that [Defendant] shall not have the obligation to commit to any minimum volume [of] Work to be entrusted to [Plaintiff], but that, given the exclusive nature of this service agreement, should any Shop Visit work be required regarding the engines listed below, such work may not be entrusted to any party other than [Plaintiff] without the prior written consent of [Plaintiff].

---

[1]      By sworn declaration, Defendant's former Vice President, Brad Carucci, avers that Defendant sent money to Plaintiff to purchase the Air Canada engines on Defendant's behalf.  (*See* Dkt. No. 30-1, at ¶ 4 [Decl. of Brad Carucci, August 12, 2012].)

[2]      At his deposition, Brad Carucci explained that a 767 aircraft has two engines. Therefore, because all of the engines in Defendant's B767 fleet had to be replaced, a total of six engines were needed.  (*See* Dkt. No. 28-15, at 20:10-14 [Dep. of Brad Carucci, June 13, 2012].)

(Dkt. No. 28-3, at 88 [Ex. 1 to Decl. of Jean-Pierre Bastien, July 5, 2012].)  Annex E identifies

by serial number the six Air Canada Engines as well as the six engines of Defendant's that are

involved in the program.  *See id.*  Plaintiff interprets Annex E to state that it was to combine

parts from the six "donor engines" (the Air Canada engines) and the six "receiver engines"

(Defendant's engines) to produce a total of six overhauled engines for Defendant.  (*See* Dkt. No.

28-1, at ¶ 4 [Pl.'s Rule 7.1 Statement].)  Defendant counters that Annex E provides that Plaintiff

would repair up to six JT9D-7R4 engines, at Defendant's election to the volume of work to

submit to Plaintiff.  (*See* Dkt. No. 30-2, at ¶ 4  [Def.'s Response to Pl.'s Rule 7.1 Statement].)

The parties agree that the work would be performed in accordance with a mutually

agreed schedule that would specify the applicable turnaround time ("TAT").  Further, the

Agreement provides that

> [Defendant] shall pay the full amount of invoices without any off-set
> or deduction.  Invoices not paid within thirty (30) days from the date
> of receipt of the invoice shall be considered overdue.  All overdue
> payments shall bear interest at a rate of one and a half percent (1.5%)
> per month (eighteen percent (18%) per annum), until paid, without
> prejudice to [Plaintiff's] right to terminate this Agreement for non-
> payment of charges, when due, including interest on overdue
> payments.  Notwithstanding . . . , in the event that [Defendant] has a
> legitimate, substantiated reason(s) for believing that an error has been
> made in an invoice sent by [Plaintiff] to [Defendant], . . . [Defendant]
> shall notify [Plaintiff] in writing or by fax (with delivery
> confirmation) or by email of the precise nature of the alleged error(s)
> within thirty (30) Business Days of the date of invoice.

(Dkt. No. 28-3, at 13 [Ex. 1 to Decl. of Jean-Pierre Bastien, July 5, 2012].)  According to the

sworn declaration of Defendant's former Vice President, Brad Carucci, "[n]otwithstanding the

Agreement's notice and dispute provisions, [the parties,] throughout their relationship under the

Agreement, worked out their issues informally without regard to those provisions."  (*See* Dkt.

No. 30-1, at ¶ 34 [Decl. of Brad Carucci, August 12, 2012].)[3]

Plaintiff began to work on the Annex E Program in approximately May of 2009.  After starting the Annex E Program, Plaintiff assisted Defendant in purchasing an engine from Air China that was already at Plaintiff's facilities.  Plaintiff used this Air China engine in the place of Defendant's first overhauled engine under the Annex E Program.  The Air China engine was delivered to Defendant on or about August 30, 2009.

After delivering the Air China engine to Defendant, Plaintiff began work on the next two engines under the Annex E Program (respectively, "Engine No. 2 and Engine No. 3").

_____

[3]      To the extent Defendant argues that any of its oral objections to the Invoices shall be deemed proper notification under the Agreement, it is mistaken.  Pursuant to the terms of the Agreement,

> [i]t is agreed that this Agreement and its Annexes hereto embody the entire agreement of the parties hereto with regard to the matters dealt with herein and that no understandings or agreements written or otherwise exist between the parties, except as herein expressly set out.
>
> No changes or modifications to this Agreement, or its Annexes shall be valid unless in writing and signed on behalf of each party hereto by their duly  authorized representatives.

(Dkt. No. 28-3, at 23 [Ex. 1 to Decl. of Jean-Pierre Bastien, July 5, 2012].)  When, as here, the parties to an agreement have reduced their agreement to writing, which completely and accurately embodies all of the mutual rights and obligations of the parties, "the parol evidence rule operates to exclude evidence of all prior or contemporaneous negotiations or agreements offered to contradict or modify the terms of their writing."  *Trans-Pro Logistic Inc. v. Coby Elec. Corp.*, No. 05-CV-1759, 2012 WL 526764, at *8 (E.D.N.Y. Feb. 16, 2012) (citations omitted).  Accordingly, in order to be deemed a proper objection under the Agreement, it must have been made in writing.  (*See* Dkt, No. 28-3, at 13.)

Defendant desired a spare engine to use as it awaited the delivery of Engine No. 2.  Accordingly,

Plaintiff leased a JT9D-7R4 engine from Pratt and Whitney for Defendant until Engine No. 2

was overhauled and delivered to Defendant.  On or about August 17, 2009, the parties entered

into a Sublease Agreement, wherein Defendant subleased the Pratt and Whitney engine from

Plaintiff.  On or about October 19, 2009, Plaintiff delivered Engine No. 2 to Defendant.  On or

about November 17, 2009, Plaintiff delivered Engine No. 3 to Defendant.  The parties extended

the Sublease Agreement on two occasions.  The first extension occurred on or about October 7,

2009.  The second extension occurred on or about December 1, 2009.

Plaintiff sent Defendant Invoice 03-8220-10-I dated March 19, 2010 in the amount of

$332,757.00 for the costs associated with the Pratt and Whitney engine through December 31,

2009.  Plaintiff sent Defendant Invoice 03-8223-10-S dated March 25, 2010 in the amount of

$24,600.00 for costs associated with the Pratt and Whitney engine for January 1 through 12,

2010.  Defendant has not paid the amount under either the March 19, 2010 or March 25, 2010

Invoice.  Brad Carucci testified that Defendant gave notice via email to Plaintiff disputing both

of these Invoices.  (Dkt. No. 28-15, at 43-47 [Dep. of Brad Carucci, June 13, 2012].)  The only

email in the record from Defendant to Plaintiff regarding these Invoices is a reply by Mr.

Carucci to five previous requests from Plaintiff for a signature on the Sublease Agreement,

wherein Mr. Carucci asks for a detailed account an summary of the "proposed solution"

regarding the costs assigned to Plaintiff and Defendant relating to the Sublease.  Mr. Carucci

testified that at the time of that email exchange he understood that Defendant would be

responsible for at least some of the lease charges.  (*Id.* at 47-54.)  Specifically, Mr. Carucci

testified that Defendant agreed to pay $165,000 in lease charges.  (*Id.* at 92.)

Plaintiff delivered Engine No. 4 to Defendant on or about January 15, 2010.  In support of its purported denial[4] of this statement of fact, Defendant asserts that "Engine No. 4 was not fully repaired and when it failed again after less than 400 cycles, [Defendant] returned it to [Plaintiff] to have the repairs completed, but [Plaintiff] has not finished the repairs or returned the engine."  (Dkt. No. 30-2, at ¶ 24 [Def.'s Response to Pl.'s Rule 7.1 Statement].)  In further support of this purported denial, Defendant cites Brad Carucci's deposition testimony that "one of" the engines that Plaintiff built only ran for about 400 cycles and was returned to Plaintiff for repairs that were never completed.  (Dkt. No. 30-1, at ¶ 10 [Carucci Decl.]; Dkt. No. 28-15, at 30 [Carucci Dep.])

Plaintiff delivered Engine No. 5 to Defendant on or about April 8, 2010.  In total, Plaintiff overhauled five engines pursuant to the Annex E Program and delivered those engines to Defendant.  Defendant denies this statement, reiterating its previous assertion that Engine No. 4 was not fully repaired and that when it failed again after less than 400[5] cycles, Defendant returned it to Plaintiff for repairs that were never completed.

---

4       Local Rule 7.1(a)(3) requires that the non-moving party must file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  *See* N.D.N.Y. L.R. 7.1(a)(3).  Local Rule 7.1(a)(3) also provides that "[t]he non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs." *Id.*  Here, Defendant does not, in fact, deny that Engine No. 4 was initially delivered, but points out that it had to be returned to Plaintiff for repairs, which were never completed, and that the engine remains in Plaintiff's possession.  These points are more properly asserted in a counter-statement of material facts.  However, in the interest of judicial economy, the Court considers this, and other of Defendant's similar purported denials, where they are supported by record evidence.

5       Although Defendant's Response to Paragraph 29 of Plaintiff's Rule 7.1 Statement actually says "40 cycles," based on Defendant's previous denial of Paragraph 24 of Plaintiff's Rule 7.1 Statement as well as the cited Carucci Deposition which reflects Brad Carucci's testimony that it was 400 (not 40) cycles, the Court is confident that this is a typographical error and treats it as such.

After delivering Engine No. 5 to Defendant, Plaintiff prepared the last donor engine to complete the work on what would have been the sixth and final engine under the Annex E. Program.  However, Defendant never sent the sixth and final receiver engine under the Annex E Program.  Accordingly, Plaintiff could not complete the work that it started on Engine No. 6.  In support of its purported denial of these three statements of fact, Defendant asserts that it "was not required to induct a sixth engine under Annex E, and never asked [Plaintiff] to repair a sixth engine[,]" citing Brad Carucci's sworn declaration that "[Defendant] never agreed to an induction of this sixth engine. . . ."  (Dkt. No. 30-2, at ¶¶ 26-28 [Def.'s Response to Pl.'s Rule 7.1 Statement]; Dkt. No. 30-1, at ¶ 21 [Carucci Decl.].)

Plaintiff sent Defendant Invoice 04-8232-11-I dated April 28, 2011 in the amount of $1,569,631.45 for the costs associated with material and time incurred in preparation for the overhaul of Engine No. 6.  Plaintiff sent Defendant Invoice 04-8230-11-S dated April 28, 2011 in the amount of $1,407,861.00 representing the Over and Above charges for the five engines sent to Defendant and for the material assembled in preparation for Engine No. 6.  Defendant has not paid Plaintiff the amount showed on either of these April 28, 2011 Invoices.

Regarding the April 28, 2011 Invoice related to Engine No. 6, Defendant's purported denial states that it was not liable for the Invoice and immediately disputed it because Defendant never agreed to the induction of that engine.  (See Dkt. No. 30-2, at ¶ 38 [Def.'s Response to Pl.'s Rule 7.1 Statement].)  In support, Defendant cites testimony of Brad Carucci and Defendant's President, Bill Acor, that the Invoice was disputed and further cites testimony of Mr. Carucci that the basis of the dispute was that there was never an agreed induction of that engine, and based on the terms of Annex E, Defendant was not obligated to a minimum volume of work to be entrusted to Plaintiff.  (See Dkt. No. 28-15, at 78-79 [Carucci Dep.]; Dkt. No. 28-13, at 116 [Dep. of Bill Acor, June 7, 2012].)

Regarding the April 28, 2011 Invoice related to the Over and Above charges, Defendant's purported denial states that it is not liable for that Invoice because it disputed that Invoice both in writing and over the phone on the basis of Defendant's belief that Plaintiff was not using Defendant's parts that Plaintiff already had in stock, as it was required to do, but was instead purchasing new parts.  (*See* Dkt. No. 30-2, at ¶ 40 [Def.'s Response to Pl.'s Rule 7.1 Statement]) (citing Dkt. No. 28-15, at 75 [Carucci Dep.]; Dkt. No. 30-1, at ¶ 21 [Carucci Decl.].)

In addition to the services performed to JT9D-7R4 engines under Annex E, the Agreement also governed repair and overhaul services to CFM56-3 engines ("CFM engines"). On or about February 4, 2010, Defendant sent Plaintiff a CFM engine for repair and overhaul services.  According to Brad Carucci, the engine belonged to Club Excellence, a shareholder of Defendant.  (*See* Dkt. No. 30-1, at ¶ 11 [Carucci Decl.].)  On or about March 3, 2010, Plaintiff began work on the CFM engine.  Plaintiff never received any payment from Defendant for the work performed on the CFM engine.  According to Bill Acor, the CFM engine belonged to Club Excellence, not Defendant, and therefore, Defendant was not responsible for the Invoice it received for the work performed on the CFM engine.  (*See* Dkt. No. 28-13, at 91:7-22 [Acor Dep.].)

Plaintiff sent Defendant Invoice 07-8258-10-P dated July 22, 2010 in the amount of $160,000 and Invoice 04-8231-11-P2 dated April 28, 2011 in the amount of  $290,917.02 for the costs associated with the CFM engine.  Defendant has not paid either Invoice.  Defendant, in its purported denial regarding the July 22, 2010 Invoice, contends that it immediately disputed the Invoice as premature, since it represented work that Plaintiff had not yet completed at the time of the Invoice, and has never performed.  In support of its purported denial Defendant cites Brad Carucci's testimony that Defendant disputed the Invoice as premature.  (*See* Dkt. No. 28-15, at

9

60 [Carucci Dep.].)  The record also includes Bill Acor's testimony that Defendant was not liable to Plaintiff for the Invoices related to the CFM engine because that engine belonged to its shareholder, Club Excellence, and did not belong to Defendant.  (*See* Dkt. No. 28-13, at 91 [Acor Dep.].)

Finally, Plaintiff sent Defendant Invoice 04-8223-11-I dated April 28, 2011 in the amount of $86,867.20, representing the interest charges for all Invoices that remain unpaid by Defendant.  Defendant has not paid that Invoice.  In support of its purported denial, Defendant asserts that it is not liable for that Invoice because it does not owe any money on the underlying Invoices, relying on Bill Acor's testimony to that effect.  (*See* Dkt. No. 28-13, at 118 [Acor Dep.].)

In total, the Invoices represent $3,872.633.67 owed to Plaintiff by Defendant.  Defendant argues that it has disputed all of the Invoices, as Plaintiff has already been paid or has not completed the work for which it billed, citing Paragraphs 14 through 29 of Brad Carucci's Declaration.  Plaintiff asserts in Paragraph 47 of its Rule 7.1 Statement that Defendant did not submit written notice disputing any of the Invoices.  Defendant denies this fact without citation to the record.

## II.    RELEVANT LEGAL STANDARDS

### A.    Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's recent decision in *Pitts v. Onondaga County Sheriff's Dep't*, 04-CV-0828, 2009 WL 3165551, at *2-3 (N.D.N.Y. Sept. 29, 2009) (Suddaby, J.), which accurately recites that legal standard.

### B.   Legal Standards Governing Plaintiff's Claims

Pursuant to the Agreement, it "shall be governed by and interpreted in accordance with the laws of the State of New York."  (Dkt. No. 28-3, at 24 [Ex. 1 to Bastien Decl.].)  Under New York law, in order to prevail on a claim for breach of contract, a party must prove "(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages."  *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011). Summary judgment on such a claim may be granted where the terms of the contract are unambiguous.  *See id.*

## III.   ANALYSIS

The parties agree that they entered into the Agreement.  They also agree that Plaintiff presented each Invoice to Defendant and that Defendant has not paid Plaintiff under any of those Invoices.  The parties dispute whether Plaintiff adequately performed under the Agreement and whether Defendant breached the Agreement.  Because there are material questions of fact regarding one or both of these elements as it relates to each of the Invoices, Plaintiff's motion for summary judgment is denied.

### A.   Whether It Is Undisputed That Plaintiff Adequately Performed Under the Agreement

After carefully considering the matter, the Court answers this question in the negative in part for the reasons stated by Defendant in its memorandum of law (Dkt. No. 30, at 5-7 [Def.'s Mem. of Law]).  The Court would add the following analysis.

#### 1.   CFM Engine Invoices

It is undisputed that the Agreement governed repair and overhaul services to CFM56-3 engines.  However, there is a dispute regarding whether Defendant was liable for the repair and overhaul services to the particular CFM engine that is the subject of Plaintiff's July 22, 2010

Invoice for $160,000 and April 28, 2011 Invoice for $290,917.02.  According to Bill Acor, Defendant's President, Defendant was not liable to Plaintiff for the cost of repairs to the CFM engine because it did not belong to Defendant, but belonged to Club Excellence, which is one of Defendant's shareholders.  (*See* Dkt. No. 28-13, at 91 [Acor Dep.].)  Other evidence supporting this assertion includes a July 7, 2011 email from Defendant's general counsel to a representative of Plaintiff indicating that the CFM engine that is the subject of the July 22, 2010 Invoice belongs to Club Excellence and that Plaintiff needs to deal directly with that entity.  (*See* Dkt. No. 30-1, at Ex. D [Carucci Decl.].)  To be sure, Defendant's former Vice President, Brad Carucci, testified that he had authority to, and did approve payment of that Invoice.  Mr. Carucci further testified,  "I believe there was an agreement in the background that I wasn't aware of that we would pay and then we would get reimbursed [by the owner] basically because we were just helping this situation."  (Dkt. No. 28-15, at 61:11-17 [Carucci Dep.].)  Accordingly, based on the current record, a reasonable fact finder could conclude that Club Excellence, not Defendant, is liable to Plaintiff for the repairs to the CFM engine.  For this reason alone, summary judgment is not appropriate regarding Plaintiff's breach of contract claim for Defendant's failure to pay the July 22, 2010 Invoice Number 07-8258-10-P for $160,000 or the April 28, 2011 Invoice Number 04-8231-11-P2 for $290,917.02.

## 2.     Pratt and Whitney Engine Invoices

It is undisputed that Defendant entered into a sublease with Plaintiff for use of the Pratt and Whitney engine and that the sublease was extended twice.  Further, Brad Carucci testified that he understood Defendant to be at least partially responsible for the costs associated with the sublease that are reflected in the March 19, 2010 Invoice for $332,757 and March 25, 2010 Invoice for $24,600.  (*See* Dkt. No. 28-15, at 52 [Carucci Dep.].)  However, he also testified that

there was a disagreement between the parties regarding who was going to pay for the lease of the engine since Plaintiff agreed it would pay due to their turnaround time issue.  (*See id.* at 47:3-8.) Evidence of this disagreement is reflected in an email exchange between Brad Carucci and Patrick Ducharme, Plaintiff's account manager.  (*See id.* at Ex. 35.)  After five requests by Mr. Ducharme to Mr. Carucci for a signature on a sub-lease agreement, Mr. Carucci responded by requesting a summary of the costs Plaintiff is accepting for delivery delays as well as Defendant's exposure regarding the lease.  (*See id.*)  Mr. Ducharme responded with a breakdown of the costs each party should pay regarding the lease.  (*See id.*)  According to Mr. Ducharme, the total costs assigned to Defendant total approximately $400,000.  (*See id.*)  Therefore, a factual dispute exists regarding the extent to which Plaintiff is liable for the costs represented on the Pratt and Whitney Invoices based in part on Defendant's turnaround time for Engine 2 under Annex E to the Agreement.  For this reason alone, Plaintiff is not entitled to summary judgment regarding the March 19, 2010 Invoice Number 03-8220-10-I for $332,757 or the March 25, 2010 Invoice Number 03-8223-10-S for $24,600 related to the Pratt and Whitney engine.

### 3.      Remaining Invoices

#### a.      Preparation of Engine No. 6

Invoice Number 04-8232-11-I for $1,569,631.45, dated April 28, 2011, represents Plaintiff's preparation of Engine No. 6 for overhaul.  Defendant does not dispute that Plaintiff prepared a sixth engine for overhaul, but does dispute that it asked Plaintiff to do so.  According to Brad Carucci, Defendant authorized induction of the first five engines, which it received by April 8, 2010, but it did not authorize induction of the sixth engine.  (*See* Dkt. No. 30-1, at ¶¶ 9, 21 [Carucci Decl.].)  Mr. Carucci testified that the preparation of Engine No. 6 was not previously agreed to under Annex E because by its terms, Defendant did "not have the obligation

to admit to any minimal amount of work to be entrusted to [Plaintiff.]"  (Dkt. No. 28-15, at

79:16-21 [Carucci Dep.].)  To be sure, the Agreement provides that Defendant shall not have the

obligation to commit to any minimum volume of work to be entrusted to Plaintiff and that

further, "[t]he schedule of the engines shall be mutually agreed to by both parties, and will be

driven by the removal schedule of [Defendant's] fleet, and [Plaintiff's] planning schedule and

capacity."  (Dkt. No. 28-3, at 88.)  Therefore, there is a question of fact regarding whether

Plaintiff was authorized to perform the work for which it billed Defendant in the April 28, 2011

Invoice Number 04-8232-11-I for $1,569,631.45.  Accordingly, for this reason alone, Plaintiff is

not entitled to summary judgment regarding that Invoice.

       **b.**       **Over and Above Charges for Engines 1 through 5**

      Invoice Number 04-8230-11-S for $1,407,861, also dated April 28, 2011, represents Over

and Above charges for Engines No. 1 through 5.  It is undisputed that Plaintiff delivered five

engines to Defendant under the Agreement.  However, Defendant argues that Plaintiff failed to

adequately perform under the Agreement as it relates to repairs that were necessary to Engine

No. 4 but were never completed.  According to Brad Carucci, one of the engines that Plaintiff

built "only ran for about 400 cycles" and is currently in Plaintiff's possession because Defendant

sent it to them for repairs.  (Dkt. No. 28-15, at 30:5-11 [Carucci Dep.].)  (*See also* Dkt. No. 30-1,

at ¶ 29 [Carucci Decl.].)  However, Bill Acor testified that the engine "ran . . . slightly over one

year" before it failed.  (Dkt. No. 28-3, at 48:9-18 [Acor Dep.].)  Mr. Acor further admitted that

by the terms of the warranty, it did not apply to cover the repairs.  (*See id.* at 50:5-11.)  To be

sure, the Agreement provides that Plaintiff warrants that engine and engine parts shall be free

from defects in workmanship for 365 days or 3,500 flight hours, whichever shall first occur.

(*See* Dkt. No. 28-3, at 91.)  Accordingly, there is no dispute that Plaintiff adequately performed

under the Agreement as it relates to the failure of Engine No. 4.

However, Defendant further argues that Plaintiff failed to adequately perform under the Agreement as it relates to Engines No. 1 through 5 because it failed to use Defendant's parts that it had in its possession and instead purchased new parts.  (*See* Dkt. No. 28-15, at 75:15-23 [Carucci Dep.].)  To be sure, Note 2 to Annex E of the Agreement provides, "The assumption made for all material is that out of twelve engines there should be enough repairable parts to build six good engines.  If however there are parts that are not salvageable, [Plaintiff] will procure these parts which will be added to the Fixed Price plus a handling fee."  (Dkt. No. 28-3, at 89 [Ex. 1 to Bastien Decl.].)  Accordingly, there is a question of fact regarding whether Plaintiff adequately performed under the Agreement as it relates to the use of parts for Engines No. 1 through 5.  For this reason alone, Plaintiff is not entitled to summary judgment regarding Invoice Number 04-8230-11-S for $1,407,861.

### 4.    Defendant's Engines and Parts in Plaintiff's Possession

In its response to Plaintiff's motion for summary judgment, Defendant asserts that in addition to failing to perform all of the work under the Agreement, Plaintiff has also refused to return Defendant's engines and parts that remain in Plaintiff's possession.  Plaintiff has not addressed the issue of Defendant's remaining engines and parts in its reply memorandum of law. However, approximately six weeks after briefing on the pending motion closed, Plaintiff submitted a letter brief to this Court regarding developments in Plaintiff's proceeding against Defendant in the Quebec Superior Court, Commercial Division under the Canadian Companies' Creditors Arrangement Act.  (*See* Dkt. No. 34.)  Attached to the letter brief is a decision by the Quebec Superior Court suspending decision on Defendant's motion seeking an Order to inspect and repossess certain assets pending resolution of Plaintiff's current motion for summary judgment by this Court.  In support of its decision, the Quebec Superior Court stated that "[t]he

dispute between [the parties] has been validly put before the Courts of New York.  Those Courts should resolve it, including any ancillary or preliminary motions such as the inspection of the engine in respect of which [Plaintiff] seeks payment in the U.S."  (*See id.*, at 5.)  Specifically, that Court stated, "the order to inspect (or not) should come from the Court before which the litigation over payment is pending."  (*Id*.)

The Court is also aware, pursuant to a Status Report filed by Plaintiff, that the stay of proceedings in the Superior Court is set to expire shortly, or may have already expired, and that further, Plaintiff continues to incur substantial costs associated with storing the assets at issue. (*See* Dkt. No. 35.)

To be sure, pursuant to Annex E of the Agreement,

> [a]ll material from the twelve (12) engines will be and remain the property of [Defendant] and therefore become COP [Carry Over Parts], and may be dispositioned by [Defendant] at its discretion.  At [Defendant's] request, [Plaintiff] will provide [Defendant], free of charge, with a COP storage area located at [Plaintiff's Engine Management Center (EMC) at Trudeau International Airport in Montreal] during the term of the Agreement, at the termination of which, for any cause whatsoever, [Defendant] shall be obliged to take possession of any COP remaining at the EMC, failing which [Plaintiff] shall have the right to ship same to [Defendant] at [Defendant's] risk and expense.

(Dkt. No. 28-3, at 90 [Bastien Decl. at Ex. 1].)  However, Plaintiff's complaint seeks no relief with respect to the disposition of the Defendant's engines and parts, which ostensibly remain in Plaintiff's possession.  Further, Defendant has not asserted any counter claim in this action. Moreover, neither party has sought an order from this Court directing an inspection of the engines and parts that are at issue in Plaintiff's action before the Quebec Superior Court. Accordingly, this Court may not properly direct such an inspection at this juncture.  To the extent resolution of Plaintiff's breach of contract action may require such an inspection, the

16

Court will address that issue as it is presented.  However, especially given that Plaintiff's motion

for summary judgment is denied, the issue regarding the disposition of Defendant's engines and

parts in Plaintiff's possession is not properly addressed by this Court at this point in the

litigation.

In any event, it is clear that a question of fact has been raised regarding Plaintiff's

adequate performance under Annex E to the Agreement relating to the issue of the

appropriateness of Plaintiff's continued possession of Defendant's assets.  For this additional

reason, Plaintiff's motion for summary judgment is denied.

### B.       Whether It Is Undisputed That Defendant Breached the Agreement

After carefully considering the matter, the Court answers this question in the negative in

part for the reasons stated by Defendant in its memorandum of law (Dkt. No. 30, at 7-12 [Def.'s

Mem. of Law]).  The Court would add the following analysis.

### 1.       CFM Engine Invoices

It is undisputed that Defendant failed to give Plaintiff timely notice of Defendant's

dispute of either the July 22, 2010 Invoice or the April 28, 2011 Invoice related to the CFM

engine repair and overhaul.  Brad Carucci testified that Defendant did not dispute either the July

22, 2010 Invoice or the April 28, 2011 Invoice.  (*See* Dkt. No. 28-15, at 62:6-63:6 [Carucci

Dep.].)  In a subsequent declaration, approximately two months after he had been deposed, Mr.

Carucci averred that Defendant disputed the July 22, 2010 Invoice in writing.  (*See* Dkt. No. 30-

1, at ¶ 25 [Carucci Decl.].)  To the extent Mr. Carucci is referring to the April 7, 2011 email to

Plaintiff from Defendant's general counsel, that notice is clearly beyond the thirty days

contemplated by the Agreement, and is therefore not timely.  In any event, "it is well settled in

this circuit that a party's affidavit which contradicts his own prior deposition testimony should

be disregarded on a motion for summary judgment." *Hale v. Mann*, 219 F.3d 61, 74, n.1 (2d Cir. 2000) (citation omitted).  Disregarding Mr. Carucci's self-serving contrary declaration, as it must, the Court concludes that no reasonable fact finder could conclude that Defendant gave timely notice to Plaintiff of its dispute of either the July 22, 2010 Invoice Number 07-8258-10-P for $160,000 or the April 28, 2011 Invoice Number 04-8231-11-P2 for $290,917.02.  Therefore, should a fact finder conclude that Defendant was liable to Plaintiff for its repair and overhaul of the CFM engine, Plaintiff will be entitled to judgment in the amount of those Invoices.

## 2.    Pratt and Whitney Engine Invoices

It is undisputed that Defendant has not paid the Invoices related to the Pratt and Whitney engine.  Plaintiff also asserts that Defendant has not submitted written notice disputing any of the outstanding invoices as is required by the terms of the agreement.  (*See* Dkt. No. 28-1, at ¶ 47 [Pl.'s Rule 7.1 Statement].)  In response, Defendant denies this statement without any citation to the record.  (*See* Dkt. No. 30-2, at ¶ 47 [Def.'s Response to Pl.'s Rule 7.1 Statement].)  While the Court has discretion to deem such a statement admitted, it declines to do so here.[6]  Defendant has asserted that is has disputed several of the Invoices in writing in its response to denials of other assertions in Plaintiff's Rule 7.1 Statement, and has done so with citations to the record

---

[6]     Where a nonmoving party fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.  *See Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir.2002) (citations omitted).  For this reason, the Court may enforce Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has failed to properly respond to that statement.  *See* N.D.N.Y. R. 7.1(a)(3).  *See also Figueroa v. Tri-City Highway Prods., Inc.*, No. 08-CV-868, 2010 WL 3635247, at *2 (N.D.N.Y. Sept .10, 2010) (citations omitted).  However, the Court has considerable discretion in applying the Local Rules.  *See Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000).  Therefore, the Court may, in its discretion, decline to deem admitted a material fact that has been denied by the non-moving party without citation to the record, as long as there is support in the record for the denial.

where such evidence is found.  Accordingly, it would be improper to deem admitted Plaintiff's

assertion in Paragraph 47 of its Rule 7.1 Statement because to do so would be inconsistent with

the evidence in the record.  For example, according to Brad Carucci's deposition testimony,

Defendant disputed the Pratt and Whitney Invoices in writing.  (*See* Dkt. No. 28-15, at 44:17-

45:4, 46:21-47:8 [Carucci Dep.].)  Accordingly, a factual dispute exists regarding whether

Defendant disputed those Invoices in accordance with the terms of the Agreement.  For this

additional reason, Plaintiff is not entitled to summary judgment regarding the March 19, 2010

Invoice Number 03-8220-10-I for $332,757 or the March 25, 2010 Invoice Number 03-8223-10-

S for $24,600 related to the Pratt and Whitney engine.

### 2.    Remaining Invoices

According to Brad Carucci, Defendant disputed Invoice 04-8232-11-I for Plaintiff's

preparation of Engine No. 6 by email.  (*See* Dkt. No. 28-15, at 78 [Carucci Dep.].)  (*See also*

Dkt. No. 30-1, at ¶ 21 [Carucci Decl.].)  Bill Acor also testified that this Invoice was disputed

around the time it was received.  (*See* Dkt. No. 28-13, at 116:7-21.)

According to Mr. Carucci, Defendant also gave Plaintiff written notice of its dispute of

Invoice Number 04-8230-11-S for the Over and Above charges related to Engines No. 1 through

5 (*See* Dkt. No. 28-15, at 74:23-75:5 [Carucci Dep.].)  (*See also* Dkt. No. 30-1, at ¶ 23 [Carucci

Decl.].)

Finally, Defendant contends that it paid Plaintiff all it was due for the work it performed

"and settled all outstanding payment issues by paying a $2.8 million reconciliation in July 2010."

(Dkt. No. 30, at 7 [Def.'s Mem. of Law].)  According to Mr. Carucci, Defendant paid Plaintiff

"amounts in excess of $12 million under the Agreement.  The last of these payments was made

in July 2010 in the amount of $2.8 million.  [Defendant] understood that this payment satisfied

any and all outstanding obligations under the Agreement." (*See* Dkt. No. 30-1, at ¶ 14, Ex. A

[Carucci Decl.].)  Attached to Mr. Carucci's Declaration is an email exchange between

Defendant's general counsel, Jack Albanese, and Robert Cormeau, a representative of Plaintiff,

wherein Mr. Cormeau appears to be outlining a process by which Defendant would transfer $2.8

million to Plaintiff and Plaintiff would release "the two engines." (*Id.* at Ex. A.)  Mr. Cormeau

further explains that "Brad and Jim on our side [will] try to resolve the dispute concerning the

lease fee" and finally, "[we wait for your OK to start working on the third engine." (*Id.*)  In

reply, Mr. Albanese expressed, "That is our understanding." (*Id.*)

Plaintiff argues that (1) Mr. Carucci cannot authenticate this email because he lacks

personal knowledge, and therefore, the email is inadmissible hearsay and (2) the email in no way

states or suggests that the $2.8 million satisfied all of Defendant's outstanding obligations to

Plaintiff.  (*See* Dkt. No. 31, at 4 [Pl.'s Mem. of Law].)  To be sure, "a corporate representative

may testify and submit affidavits based on knowledge gained from a review of corporate books

and records." *Bonier v. U.S. Bank N.A.*, No. 12-CV-3809, 2013 WL 1687709, at *1 (E.D.N.Y

Apr.18, 2013) (quoting *Harrison-Hoge Indus., Inc. v. Panther Martin S.R.L.*, No. 05-CV-2851,

2008 WL 905892, at *28 (E.D.N.Y. Mar. 31, 2008)).  Accordingly, the email is admissible.

Nonetheless, Plaintiff is correct that the email in no way suggests that the parties agreed to settle

all outstanding obligations for $2.8 million.  The email is evidence, however, that the parties

understood that the $2.8 million payment would settle Defendant's obligations to Plaintiff at

least regarding two engines.

Therefore, questions of fact exist regarding whether Defendant breached the Agreement

because there is evidence in the record that it gave notice to Plaintiff disputing the Invoices

relating to Plaintiff's preparation of Engine No. 6 and the Over and Above Charges regarding

20

Engines No. 1 through 5 and that it paid Plaintiff what it was due for at least two of the engines. For these reasons, Plaintiff is not entitled to summary judgment regarding Invoice Number 04-8230-11-S for $1,407,861 and Invoice Number 04-8232-11-I for $1,569,631.45.

### 3.      Interest on All Unpaid Invoices

Finally, Plaintiff seeks summary judgment regarding Invoice 04-8233-11-I for $86,867.20.  Although there is no dispute that Plaintiff is entitled to interest of one and a half percent per month until paid on all overdue payments, for the aforementioned reasons, questions of fact remain regarding whether, and/or in what amount, Plaintiff is due payment on the underlying Invoices.  For this reason, Plaintiff is not entitled to summary judgment on its final Invoice for interest on the other unpaid Invoices.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's motion for summary judgment (Dkt. No. 28) is **DENIED**, and it is further

**ORDERED** that counsel are directed to appear on **JULY 9, 2013 at 11:00 a.m.** in chambers for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than **June 10, 2013,** and the parties are directed to engage in meaningful settlement negotiations prior to the 7/9/13 conference.  In the event that counsel find that settlement is unlikely, if counsel would prefer to participate in this pretrial conference via telephone conference for the limited purpose of scheduling trial, counsel should make that request in writing.

Dated: May 21, 2013
          Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge